WALTER M. JAMES, NANCY A. JAMES, DEBRA A. EVERIDGE, AND SHARON D. JAMES, PLAINTIFFS-APPELLANTS v. DAVID CLARK, 1-STOP, INC. OR 1-STOP FOOD STORES, INC., AND YOCO, INC., DEFENDANTS-APPELLEES

No. 9421SC481

(FILED 21 MARCH 1995)

1. **Compromise and Settlement § 9 (NCI4th)— settlement agreement—failure of defendant to meet obligations**

   Plaintiffs' claims for strict liability under the Oil Pollution and Hazardous Substances Control Act of 1978, negligence, nuisance, and trespass were not barred by the satisfaction of the terms of the parties' settlement agreement where the settlement was contingent upon payment of $15,000 and the drilling of a new well which provided "clean water"; defendant's tender of payment three years after the settlement agreement and only after plaintiffs reopened the case was not made within a reasonable time; and a new well which contained compounds commonly associated with gasoline at a level which exceeded the State standards did not meet defendant's obligation of providing a well which supplied "clean water."

   **Am Jur 2d, Compromise and Settlement §§ 1-6, 25.**

2. **Limitations, Repose, and Laches § 42 (NCI4th)— water contaminated by gasoline—knowledge of source of contamination—action not barred by statute of limitations**

   Plaintiff's OPHSCA and negligence claims were not barred by the statute of limitations where plaintiffs did not associate the bad taste in their well water with gasoline until 1986, several years after they stopped drinking it; in that same year they were officially informed that their water was contaminated with gasoline; and there was no reason why plaintiffs should have known that their well was contaminated with gasoline before 1986, which was within three years of the filing of this action.

   **Am Jur 2d, Limitation of Actions §§ 86, 87.**

3. **Limitations, Repose, and Laches § 42 (NCI4th)— gasoline leaking—recurrent trespass—actions not barred by statute of limitations**

   Where the evidence showed that plaintiffs' well was contaminated when this action was filed and indicated continuing gasoline leakage at that time, the trespass was recurrent, and thus

plaintiffs' trespass and nuisance claims were not barred by N.C.G.S. § 1-52(3) (1983).

**Am Jur 2d, Limitation of Actions §§ 86, 87.**

**4. Environmental Protection, Regulation, and Conservation § 84 (NCI4th); Trespass § 49 (NCI4th)— ground water contaminated by gasoline—defendant's storage tank system causing contamination—sufficiency of evidence**

In plaintiffs' action for OPHSCA violations, negligence, nuisance, and trespass arising from the contamination of their well water with gasoline, the evidence forecast by plaintiffs pointed to defendant's underground storage tank system as the source of the contamination and was thus sufficient to create a genuine issue of material fact as to whether defendant caused the contamination.

**Am Jur 2d, Pollution Control §§ 182 et seq.; Trespass § 215.**

Appeal by plaintiffs from order entered 10 January 1994 by Judge William H. Freeman in Forsyth County Superior Court. Heard in the Court of Appeals 26 January 1995.

*Allman Spry Humphreys & Leggett, P.A., by David C. Smith, and Linda L. Helms, for plaintiffs-appellants.*

*Francisco & Merritt, by George E. Francisco, for defendant-appellee Yoco, Inc.*

WALKER, Judge.

On 9 December 1988, Walter M. James, Nancy A. James and their daughters, Debra A. Everidge and Sharon D. James, sued defendants David Clark, 1-Stop, Inc. (1-Stop) and Yoco, Inc. (Yoco) for strict liability under the Oil Pollution and Hazardous Substances Control Act of 1978 (OPHSCA), N.C. Gen. Stat. § 143-215.75 *et. seq.*, negligence, nuisance, and trespass arising from the contamination of the James' well water with gasoline. Plaintiffs have resided at 7210 Vance Road in Kernersville since before 1979. In 1979, David Clark purchased a gas station and convenience store located across the road from plaintiffs' home. Clark purchased the store from W.R. Shreve, who had operated the store and gas station since at least 1967. Since 1979, Clark has operated the store and the only gas station in the area under a lease to 1-Stop, his corporation. At the time of purchase,

there were three gasoline pumps and underground storage tanks (USTs) located on the property which belonged to Barrow Oil. Defendant Yoco purchased the pumps, lines, and USTs from Barrow Oil in 1979 and began supplying gas to 1-Stop. Since 1979 defendant has maintained the pumps, lines, and USTs at 1-Stop and has been 1-Stop's sole supplier of gas.

In their complaint, plaintiffs allege that during the last few years they began to notice problems with their well water, including bad taste and other physical signs which "are the result of contamination of the plaintiffs' well water supply by oil, gasoline or petroleum products" which have escaped from the USTs at 1-Stop. As a result of this contamination, plaintiffs allege that plaintiffs' well water is no longer safe for drinking or other household uses, causing them to incur various expenses, including expenses for alternative sources of water. Moreover, plaintiffs contend that they have experienced pain and suffering, increased likelihood of future disease or physical problems, fear of future disease, diminished quality of life, mental distress, and a devaluation of their property value.

On 15 March 1990, pursuant to a settlement agreement among the parties, an order was entered placing the case on inactive status without prejudice to any party placing the case back on active status should the contingency in the settlement agreement not be resolved. Approximately three years later, on 5 April 1993, the case was reopened upon plaintiffs' request.

Plaintiffs were granted leave to amend their complaint and an amended and supplemental complaint was filed on 14 May 1993. Defendant Yoco answered, alleging as defenses, among other things, the applicable statutes of limitations and accord and satisfaction. Defendant Yoco's motion for summary judgment was granted by order entered 10 January 1994. Plaintiffs voluntarily dismisssed the action against defendants David Clark and 1-Stop. (Hereinafter, defendant refers to Yoco only).

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (1990). A defendant who moves for summary judgment assumes the burden of positively and clearly showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law. "A

JAMES v. CLARK

[118 N.C. App. 178 (1995)]

defendant may meet this burden by: (1) proving that an essential element of the plaintiff's case is nonexistent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense which would bar the claim." *Watts v. Cumberland County Hosp. System*, 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985), *reversed on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986). In passing upon a motion for summary judgment, all materials filed in support or opposition to the motion must be viewed in the light most favorable to the party opposing the summary judgment and that party is entitled to the benefit of all inferences in his favor which may be reasonably drawn from that material. *Whitley v. Cubberly*, 24 N.C. App. 204, 206-207, 210 S.E.2d 289, 291 (1974).

Defendant argues that plaintiffs' claims were barred by the satisfaction of the terms of the parties' settlement agreement and the applicable statutes of limitations and thus defendant was entitled to summary judgment. Defendant also argues that summary judgment was proper on each of plaintiffs' claims because plaintiffs failed to show that defendant's USTs were a source of the contamination. For the reasons discussed below, we hold that, as to each claim, defendant did not meet its burden of proving that there were no genuine issues of material fact and thus reverse.

I. SETTLEMENT AGREEMENT

[1] We first consider whether plaintiffs' claims were barred by the satisfaction of the terms of the parties' February 1990 settlement agreement. The agreement, which is set forth in a letter written by plaintiffs' attorney at the time and addressed to defendant's attorneys, provided that defendant pay $15,000 to plaintiffs for damages and attempt to dig a new deep rock well on plaintiffs' property "in hopes that it will produce clean water." The agreement further provides that "[i]f [the new well] produces clean water, then the case is settled; if it does not produce clean water, then [the parties] negotiate again . . . or remove the case from inactive status and place it back on a trial calendar" and that if the new well "comes up clean now but becomes contaminated with gasoline at a later date, the plaintiffs will be able to file a new action seeking [a] new source of clean water, but . . . any claims for damages . . . have been settled." Thus, the settlement was contingent upon payment of $15,000 and the drilling of a new well which provided "clean water."

Defendant argues that each of these contingencies was met and thus plaintiffs were not entitled to reopen the case. We disagree. First, the record shows that defendant did not tender payment of $15,000 to plaintiffs until three years later, after plaintiffs reopened the case. Defendant interprets the agreement as requiring it to pay $15,000 within a reasonable time after a determination that the new well water is clean. We agree with this interpretation and note that defendant's three-year delay in tendering payment undercuts its contention that the new well provided clean water. Defendant further argues that at least since September 1992 the well provided clean water. Even if we assume the latter to be true, defendant's tender of payment in 1993 was not made within a reasonable time.

Second, after reviewing the evidence in the record, we cannot conclude that defendant has met its obligation of providing a well which supplies "clean water." The evidence shows that DEHNR tested the new well water on seven occasions from August 1990 through February 1993. On four occasions, the presence of organic compounds commonly associated with gasoline were below the detection limit and on one occasion no volatile organic compounds were detected. However, on two occasions, 11 October 1990 and 15 June 1992, the tests revealed the presence of benzene and other organic compounds commonly associated with gasoline. The benzene levels, which were 2.2 ug/L (micrograms per liter) and 2.0 ug/L, exceeded the State standard for benzene of 1 ug/L. See N.C. Admin. Code tit. 15A, r.2L.0202(g)(5) (June 1979). In an evaluation of the 11 October 1990 test results, Dr. Kenneth Rudo, a State toxicologist, stated that "the water is probably contaminated with a petroleum product that may be gasoline, fuel oil, kerosine, or other."

Plaintiffs also introduced evidence tending to show that the well was not constructed in a manner sufficient to protect the water supply from contamination. Plaintiffs submitted the affidavit of Stephen L. Whiteside, a civil engineer specializing in environmental site investigations. Whiteside stated that the casing in the new well should have been seated several feet into bedrock and then grouted from the bottom of the borehole to the ground surface before the well was advanced below the casing in order to seal off all aquifers or zones with water of a poorer quality and that the new well was not double or triple cased in order to prevent the contamination from travelling deeper into the aquifer during or after installation. Whiteside further stated that benzene and other gasoline-related compounds have reached a lower aquifer, causing the intermittent contamination of

the new well and opined that the threat of contamination at or above State groundwater and drinking standards was continuing and that it would be prudent to abandon the new well because of the potential threat it poses to the integrity of groundwater.

## II. STATUTES OF LIMITATIONS

[2]   We next consider whether plaintiffs' OPHSCA and negligence claims were barred by the applicable statutes of limitations. These claims are governed by the three-year statute of limitations set forth in N.C. Gen. Stat. § 1-52(2) and (5) (1983). Unless otherwise provided by statute, a cause of action for personal injury or physical damage to claimant's property shall not accrue until "bodily harm to the claimant or physical damage to his property becomes apparent to the claimant or ought reasonably to have become apparent to the claimant, whichever event occurs first." N.C. Gen. Stat. § 1-52(16) (1983).

Defendant argues that the evidence, when considered in the light most favorable to plaintiffs, reveals that plaintiffs knew or should have known of the contamination for more than three years before filing the suit. Plaintiffs stopped drinking the water sometime between 1983 and 1985 because it tasted bad and stopped cooking with the water in 1984. The depositions of plaintiffs Sharon James, Debra A. Everidge, Nancy James, and Walter James indicate that they noticed something wrong with their water in late 1982, late 1985, and in 1986, respectively, but does not show that plaintiffs suspected that it was contaminated with gasoline until 1986, after Walter James' brother tasted the water and said that it "has gas in it." Plaintiffs did not know that the water was contaminated with gasoline until they had their water tested shortly thereafter and were informed that it was contaminated with benzene.

We find *Wilson v. McLeod Oil Co.*, 327 N.C. 491, 398 S.E.2d 586 (1990), *reh'g denied*, 328 N.C. 336, 402 S.E.2d 844 (1991), instructive on this issue. In *Wilson*, plaintiff families sued defendants in 1986 for gasoline contamination of their well water from leaking USTs, alleging causes of action for stict liability under OPHSCA, negligence, nuisance and trespass. Our Supreme Court affirmed the summary judgment against plaintiff White's OPHSCA and negligence claims and reversed the summary judgment against plaintiffs Hill and Wilson based on the statute of limitations. *Id.* at 511-512, 398 S.E.2d at 596. The evidence showed that plaintiff White discovered the contamination in 1979, when tests performed by the Alamance County Health

Department (ACHD) revealed the presence of gasoline in her well water, and that plaintiffs Hill and Wilson did not discover the contamination until 1984, when ACHD tests detected gasoline contamination. *Wilson*, 327 N.C. at 502, 511-512, 398 S.E.2d at 591, 596. The defendants in *Wilson* argued that the statute of limitations should begin to run against plaintiffs Hill and Wilson from 1982, the time these families first began to notice that their well water smelled like gasoline, rather than 1984, when plaintiffs were officially informed that their water was contaminated with gasoline.

In holding that the plaintiffs' claims were not barred by the statute of limitations, the court in *Wilson* noted that the forecast of evidence clearly showed that plaintiffs Hill and Wilson had the State test their water on several occasions prior to May 1984 and had been assured that their water was not contaminated by gasoline and that despite the negative test results, plaintiffs did everything they could do to get NRCD (DEHNR's predecessor) to continue to test their water for gasoline contamination. *Wilson*, 327 N.C. at 512, 398 S.E.2d at 596. The court stated "[p]rior to the determination by the ACHD that their water was contaminated, the [plaintiffs] did not know that they had a cause of action for contamination of their water." *Id.*

In the case *sub judice*, plaintiffs, unlike the plaintiffs in *Wilson*, did not even associate the bad taste in their well water with gasoline until 1986, several years after they stopped drinking it, and in that same year were officially informed that their water was contaminated with gasoline. After reviewing plaintiffs' depositions, we are not convinced that plaintiffs should have known that their well was contaminated with gasoline before 1986, more than three years before filing this action. Since the evidence is sufficient to support an inference that the limitations period has not expired, we hold that the summary judgment on plaintiffs OPHSCA and negligence claims was inappropriate. *See Hatem v. Bryan*, 117 N.C. App. 722, 453 S.E.2d 199 (1995).

[3] Defendant also argues that summary judgment was proper on plaintiffs' trespass and nuisance claims. A cause of action for nuisance is governed by the same statute of limitations as a cause of action for trespass. *Wilson*, 327 N.C. 491, 511, 398 S.E.2d 586, 596. Under N.C. Gen. Stat. § 1-52(3) (1983), a cause of action for a continuing trespass "shall be commenced within three years of the original trespass." Thus, the statute of limitations on claims for continuing trespass and nuisance begins to run from the first act of trespass. However, where the trespass is recurrent, as opposed to continuing,

the limitations period does not bar the claim. *See Roberts v. Baldwin*, 151 N.C. 407, 66 S.E. 346 (1909). Defendant argues that plaintiffs' trespass and nuisance claims are barred because the trespass is continuing, not recurrent, and the evidence shows the contamination from 1-Stop to plaintiffs' well occurred more than three years from the filing of this action.

We disagree. In *Wilson*, the Supreme Court resolved the same issue in plaintiffs' favor, holding that the release of gasoline from a UST into the groundwater of an adjoining property owner over a period of years was a " 'renewing rather than a continuing trespass.' " *Wilson*, 327 N.C. at 511, 398 S.E.2d at 596 (citation omitted). The court noted that "in the present case, tests revealed that [plaintiffs'] well remained contaminated with gasoline as of the filing of this action [and] [g]asoline was found in the dirt surrounding the [defendant's tanks] . . . indicating that the seepage from the [defendant's property] . . . had not stopped at the time this suit was filed." *Id.* at 510, 398 S.E.2d at 595. Since the evidence in this case likewise shows that plaintiffs' well was contaminated when this action was filed and indicates continuing gasoline leakage at that time, we likewise hold that the trespass was recurrent and thus plaintiffs' trespass and nuisance claims were not barred by N.C. Gen. Stat. § 1-52(3) (1983).

## III. CAUSATION

[4] Finally, we consider whether causation, an essential element of plaintiffs' claims, was lacking. Causation is a common element necessary in each of plaintiffs' claims. *See Ammons v. Wysong & Miles, Co.*, 110 N.C. App. 739, 745, 431 S.E.2d 524, 528, *cert. denied*, 334 N.C. 619, 435 S.E.2d 332 (1993) (stating that causation is a common element necessary in each of plaintiffs' claims in suit alleging violation of OPHSCA, negligence, nuisance and trespass arising out of contamination of plaintiffs' wells). In *Ammons*, this Court, relying on *Wilson v. McLeod Oil Co., Inc.*, affirmed summary judgment for defendant on plaintiff's OPHSCA, negligence, nuisance and trespass claims because plaintiff failed to show that the potential sources of contamination from defendant's property caused them damage. *Id.* at 745, 431 S.E.2d at 528. Defendant argues that plaintiffs, like plaintiffs in *Ammons* and *Wilson*, failed to show that defendant was a source of contamination.

The evidence shows that on 10 July 1986, Walter James contacted the Winston-Salem regional office of the North Carolina Division of Environmental Management (regional office) and reported that his well had a strong gasoline odor for the preceding five years. In

response to his complaint, Stephen Kay, an Environmental Engineer with the State of North Carolina, Department of Environment, Health and Natural Resources (DEHNR), performed an investigation on plaintiffs' property. Lab tests of plaintiffs' well water showed that plaintiffs' groundwater was contaminated by gasoline constituents. Defendant's USTs, located 150 feet upgradient from the well, were the only known potential source of contamination. Plaintiffs were instructed not to drink the water.

Plaintiffs deposed defendant's maintenance supervisor, Jerry Atkins. Since 1989, Atkins worked on the gasoline pumps at various stations to which defendant supplied gas. Atkins was involved in the investigation of defendant's equipment at 1-Stop and had some knowledge of defendant's inspection and tests preceding 1989. Atkins testified that in 1986, after the State notified defendants that plaintiffs' well water was contaminated and that 1-Stop was a potential source of the contamination, defendant hired Collins Petroleum to look for contamination in the soil around its USTs. Collins dug up the soil around the USTs and found no contamination. Three years later, in 1989, defendant dug up its UST's and tested the tanks and gas lines. No leaks were found. However, the soil surrounding the tanks was tested and showed contamination and a monitor well contained two to three feet of free product, indicating groundwater contamination. Although the monitor well had constituents of leaded gas, no soil contamination was found under the UST which stored leaded gas. Defendant replaced the tanks and remediated the soil. Tests performed on samples from the 1-Stop monitor well subsequent to the UST replacement continued to indicate groundwater contamination. Defendant kept inventory records of the gas it supplied to 1-Stop. To Atkins' knowledge, those records never showed any lost or missing product at 1-Stop.

In March 1988, the regional office drilled and collected water samples from five monitor wells and collected samples from domestic wells used by plaintiffs, 1-Stop, and two other neighboring properties. All except one well at plaintiffs' and 1-Stop's properties were highly contaminated by hydrocarbons. In August 1989, the regional office recommended that the site be included under the Federal Trust Fund Program. The site was designated as the Walter James Trust Fund Site. Subsequently, in 1990, DEHNR hired Geophex to conduct a remedial investigation of the site and to recommend appropriate remedial alternatives.

After its investigation, Geophex prepared a final report which mentioned 1-Stop as the only potential source of hydrocarbon leakage. The report suggested that the UST area on the east side of 1-Stop may have been one of the old leakage sources. Geophex found that an area "6,000 to 8,000 square feet, including the present and former UST areas and pump islands, contains contaminated soil down to the water table." Soil samples from 1-Stop and plaintiffs' property indicated that the fuel contaminating the soil is likely an unleaded product. Free product, most likely premium grade gasoline, was discovered in two co-located monitor wells at 1-Stop. Water samples were taken from monitor wells at 1-Stop, plaintiffs' property, and a neighboring property. Most of the parameters contained in gasoline were found in all of the water samples. Based on its study, Geophex concluded that: (1) 1-Stop is extensively contaminated by old and recent hydrocarbon products, that it believed the product leakage is recent and probably current and that the UST system (tank and/or lines) dispensing the premium gasoline may have leaked recently or continues to leak, (2) the site also contains old leaks or spills that are likely from a former multiple UST site to the east, (3) the contaminant plume is migrating eastward from 1-Stop and the dissolved groundwater contamination extends to properties of two households eastward across Kerner Road, and (4) the plaintiffs' well is heavily contaminated with gasoline contituents that originated from 1-Stop.

Pursuant to plaintiffs' request for admissions, defendant admitted that chemicals released from 1-Stop had contaminated the groundwater but stated that it had insufficient information to enable it to admit or deny that the contamination was caused by chemicals released from USTs.

Plaintiffs deposed Gary York, defendant's president and sole shareholder. In his deposition, York admitted that defendant purchased some tanks and lines at the 1-Stop property from Barrow Oil in 1979 and that defendant currently owns the USTs and equipment at 1-Stop but denies knowledge of exactly what existing equipment it purchased from Barrow Oil in 1979. Plaintiffs also deposed David Clark, who testified that in 1980 defendant removed one or more of the USTs previously owned by Barrow and located on the east side of the lot, replaced them, and moved the pump island and lines. Defendant did not check the area surrounding the USTs for contamination after it removed them.

**JAMES v. CLARK**

[118 N.C. App. 178 (1995)]

In this case, unlike *Ammons*, the issue before us is not whether plaintiffs forecast evidence sufficient to show that the suspect property, 1-Stop, is the source of contamination, but whether they forecast evidence sufficient to create a genuine issue of fact as to whether defendant's UST system caused the contamination.

Although the evidence indicates that the USTs and lines at the new pump island were not leaking, the 1990 Geophex report, which finds old and new leakage, suggests as possible sources of contamination both the USTs which defendant removed in 1980 and the USTs which replaced them.

Moreover, the evidence suggests that the contamination may have been caused by other sources such as spillage from overfills of gas in defendant's USTs, for which defendant would be responsible. In his deposition, Clark recalled between one and three spills or overfills of gas in the years preceding 1986. Atkins recalled hearing about two or three spills at 1-Stop since 1985. Atkins also testified that when the USTs were removed in 1989, the soil above the top of the USTs was contaminated, suggesting that the USTs had been overfilled.

Defendant contends it has shown that its UST system could not have been the source of contamination. For support, defendant points to (1) the absence of any evidence showing that its USTs and lines leaked, (2) Geophex's finding of old and new contamination at 1-Stop, (3) the fact that prior to 1979, the USTs and lines were owned and operated by Barrow Oil, (4) the fact that defendant does not know what equipment it purchased from Barrow Oil in 1979, and (5) the fact that defendant replaced one or more of the existing USTs previously owned by Barrow in 1980.

However, in viewing the evidence in the light most favorable to plaintiffs and drawing all inferences which may be reasonably drawn in plaintiffs' favor, we find that the evidence forecast by plaintiffs points to defendant's UST system as the source of the contamination and was thus sufficient to create a genuine issue of fact as to whether defendant caused the contamination. *Cf. Masten v. Texas Co.*, 194 N.C. 540, 140 S.E. 89 (1927) (evidence that plaintiff's well was 130 feet downgradient from defendant's tank, that defendant's tank was the only gas tank within at least one-half mile of plaintiff's home, plaintiff's well water was fine until defendant installed tank, and excavated tank had leak sufficient to withstand motion for nonsuit in action to recover for pollution of plaintiff's well water).

Based on the foregoing, we reverse summary judgment in favor of defendant.

Reversed and remanded for trial.

*Judges EAGLES and GREENE concur.*